PER CURIAM.
These two cases, consolidated for trial, involve an election contest arising from a primary election held in the 21st Judicial District for the purpose of nominating a Democratic nominee for the office of District Judge.
Suit No. 5197 was originally before us on an exception of no cause of action and was, for reasons set forth in our original opinion reported in Volume 123 So.2d 636, remanded to the district court for trial on the merits after our reversal of the judgment of the trial court sustaining defendant’s exception of no cause of action.
Suit No. 5197 is presently before us on the merits, plaintiff therein appealing the judgment of the lower court dismissing her action after trial.
The issues presented in suit No. 5197 were set forth in detail in our original opinion and will not be reiterated herein except insofar as may be necessary for a clear understanding of the propositions presented for determination.
Subsequent to our remand of the initial suit plaintiff-appellant instituted a second action, No. 5198 on the docket of the court, wherein she contests the qualifications of defendant, Warren Cornish, to participate in the primary election on the ground that said defendant was not a qualified member of the Louisiana State Bar Association on the date of his qualification as a candidate and election as nominee as required by the provisions of Article 7, Section 33 of the State Constitution, LSA.
By agreement of counsel for all parties the two actions were consolidated on appeal with the understanding that one judgment would be rendered disposing of all of the issues presented in both actions.
Plaintiff’s basic contention in her initial action, No. 5197, is predicated primarily upon allegations of fraud and irregularities which may be classified as falling into two categories:
She. first contends the entire vote in ward 2, St. Helena Parish, as well as the entire vote cast in precinct 1, ward 9, Livingston Parish (both being courthouse precincts) should be expunged for the reason the secrecy of the ballot was allegedly deliberately violated by so placing the voting machines used in these controversial precincts that the electors could be and were observed in the act of voting and their choice of candidates detected from vantage points on stairways immediately adjacent to the machines in question. In this connection she alleges that other persons (particularly representatives of her opponents), could and did take advantage of the condition mentioned and accomplished their intention of intimidating electors:
Secondly, she maintains that because of alleged irregularities all of the absentee ballots cast in said election should be disregarded, primarily because in practically every instance the absentee ballots were kept by the Clerks of Court in envelopes placed in desks or other articles of office furniture and not put in the machines upon the close of the polls and tabulation of the results.
The results of the election as promulgated by the 21st Judicial District Democratic Executive Committee showed defendant Cornish received a vote of 11,251 votes to 10,957 votes for the plaintiff-appellant,, thus affording defendant a majority of 292 votes.
*642 It is plaintiff’s contention that if the results of the two disputed precincts were expunged she would be entitled to be declared the Democratic nominee, which relief she prays for.
In the alternative she prays that because of frauds and irregularities a new election should be ordered.
With regard to the alleged violation of the secrecy of the ballot at precinct 1, ward 9, Livingston Parish, and ward 2, precinct 1, St. Plelena Parish the trial judge in his written reasons for judgment, made part of the record, found and stated as follows:
“In support of this allegation the plaintiff offered four witnesses, Shell Plughes, Lee Mack, Mrs. Newton Green and Will Plughes. Mr. Shell Hughes testified he was the deputy in charge of the precinct. He testified he was there all day and he could not say that he knew of anything that went wrong on that day. He testified that he did not go up the steps to see if the voters ballot could be seen, but after somebody told him what they thought was going on he evidently became suspicious. He testified that he saw some of the Deputy Sheriffs go up and down the steps to the Sheriff Office, which is located on the second floor. He did not notice any of them pausing or attempting to snoop on the ballotiing. Mr. Hughes is a good man and was a deputy in charge of this box and the court cannot help but believe that if the snooping was going on to the extent claimed by plaintiff, he would have noticed it and put a stop to it, which he had the power to do.
“The next witness is Mr. Lee Mack. Mr. Mack testified that he was a strong supporter of the plaintiff, that he was a member of the Parish Democratic Central Committee, and that he helped set and set up the machines. This precludes the proposition that the machines were ’ deliberately set up by plaintiff’s opponents with a view of destroying the secrecy and intimidating and forcing people to vote like they wanted them to. In addition, Mr. Mack further testified that he did go up on the steps and he could see people vote. He stated he went for curiosity only and during the entire election day no protest or complaints were filed by anyone. He further stated that he saw certain deputies going up and down the steps to and from the Sheriff’s office. He further testified that it was as clean an election as had ever been held in Livingston Parish and that the machines were in the same position as they were in the past three or four elections, and that no one had ever protested as to the location of the machines. He testified also that he did not detect anything wrong and if there had been he would have had the deputy remove people from standing on the steps.
“The next witness, Mrs. Newton Green, testified that she went in and voted and when she started to come out of the booth she looked up and saw Mr. Lott on the steps and he was looking at her. Mrs. Green was obviously a supporter of Judge Burch and she was the only witness who says that someone saw her. She did not say that he saw her vote but when she went to come out of the machine he was on the steps and looking at her.
“The next witness, Mr. Will Hughes, did not seem to know anything and was very quickly excused.
“We will next take up the allegations concerning Ward 2 Precinct 1 of St. Helena Parish, where the same allegations were made concerning the deliberate placing of the machines in such a position that the voters could not vote in secrecy and that their ballots could be seen. The first witness placed on the stand was Mrs. Prentiss Carter *643 Jr. who was Judge Burch’s commissioner in this precinct. She testified that late in the afternoon one of the other commissioners, Mr. J. D. Redmond, told her that he thought the people on the steps could see inside the machine when people were voting. She stated she went up the steps to see and did see people voting because she was able to see the control lever and the top lever candidate, and that she saw a Negro woman vote hut turned aside to keep from seeing Cleon Hutchinson’s son vote. She stated that no complaints were ever made, she made no complaints and, of course, eventually reported it to Judge Burch or her attorneys. She testified as to certain parties being on the steps who, later evidence disclosed, were supporters of Judge Cornish.
“Quitman Crouch was the next witness who was the registrar of voters of St. Helena Parish. He stated that the police jury was in session on the second floor and that he had seen people use the steps and that he went up and down the steps and at one time noticed a person voting. He likewise made no protest or complaint and did nothing to have the machines moved so that they could not be seen. As I recall his testimony, he stated that the only machine he could see into was the north machine.
“The next witness was Mr. David McKinney. Mr. McKinney testified that he saw certain people on the steps who he knew were supporting Judge Cornish. He knew of one lady, his sister-in-law, who did not vote because she had heard that people could see how she voted. He was not a commissioner on election day and did not go up the stairs and look to see if he could see anyone voting. He knew of no direct intimidation of his own knowledge.
“The next witness was Ray Chaney. He testified that he saw people sitting on the stairs and that when the bell rang for the police jury meeting that they went up stairs to the meeting, especially Mr. Cleon Hutchinson who was a member of the Policy Jury and who was a supporter of Judge Cornish.
“The next witness was Lawrence Daniels who was a commissioner in the election. He testified that he had placed the machines in the position they were in, one of the reasons being that he wanted them in the exact position as in his race for re-election to the policy jury in which he was defeated, and that he went up the steps to look and see if he could see how people voted. He testified that he could not because the person’s head was in the way. From then on he noticed no misconduct, no complaints were filed or no effort made to move the machines so that the voters’ ballots would be secret if they were actually being seen. He observed no intimidation or nothing illegal and he did not see Mrs. Carter go up to look and see if she could see how people voted in the machine.
“The next witness was Mr. J. D. Redmond, a former Sheriff of St. Helena of 12 years, and a very active politician in the parish. Mr. Redmond testified that he went up on the steps and could not see how people voted because of a head being in between. A controversy arose over his statement to attorneys for Judge Burch and two of her attorneys and Mr. McKinney testified that in an interview he told them he could see in the machine. The court at first refused to permit these attorneys and Mr. McKinney to testify concerning Mr. Redmond’s statement because it was an impeachment of their own witness, but after the second trial started, the court allowed the evidence to go in. Whatever conversation Mr. Redmond had with these two young lawyers and Mr. McKinney the court is unable to say, but *644 to my knowledge Mr. Redmond is frank and out spoken and fearless in the discharge of his duties. He has been an active opponent of Sheriff Bridges of St. Helena Parish for many years and was defeated by Sheriff Bridges two or three times in his race for re-election. Knowing Mr. Redmond, and knowing his disposition the court can’t help but believe that the alleged illegalities concerning the intimidation and the wholesale observance of the ballotfing by any of the deputies or influential friends of the sheriff or Judge Cornish would have been vigorously or strongly protested by Mr. Redmond and would have prompted the changing of the machines to where they could not be seen, assuming that they were seen.
“The court feels that these two precincts which are sought to be eliminated completely are the controlling factors in this suit. The returns of Ward 2 of St. Helena Parish show Judge Cornish received 2S3 votes, and Judge Burch 91, and in Ward 9 Precinct 1 of Livingston Parish, Judge Cornish received 341 votes and Judge Burch received 210. The net result, if these two precincts were eliminated, would give Judge Burch a majority of one vote.”
Plaintiff relies primarily upon the decision rendered in Hart v. Picou, 147 La. 1017, 86 So. 479, in urging that we disregard the entire votes cast in the two allegedly questionable precincts. Our reading of the Picou case, supra, reveals a situation wherein it was held failure to use ballots bearing detachable numbered slips as provided for by law vitiated each vote cast upon such a ballot. In the cited case it appears the commissioners appointed to hold an election did not receive official ballots from the Secretary of State and proceeded to have ballots printed locally, which ballots, because of lack of proper equipment could not be prepared with detachable numbered slips. The court therein held use of such ballots made fraud possible in that it could have resulted in “illegal endless chain balloting”, and altho such irregularities were not shown or proven, the possibility there was deemed sufficient to justify voiding the election. By analogy learned counsel for appellant maintains that since it was possible for each and every voter to be observed in the act of voting it was possible that fraud could have been committed, and therefore we should apply the rule of the Hart case herein.
We believe the case at bar distinguishable from the Hart case, supra, for the simple reason that the condition prevailing in the Hart case involved the secrecy of every ballot cast in an entire election, whereas the alleged violation of secrecy in the case presently before us involved only a small percentage of the precincts at which was held the election in question. Moreover, the evidence is conflicting on the question of whether each of the machines at the two precincts involved could actually be looked into, and with respect to those machines the interiors of which could be viewed from the stairway, there appears conflicting evidence as to whether the ultimate choice of the voter could actually be determined by persons standing on the stairway.
It is the settled jurisprudence of this State that as a general proposition, in the absence of specific facts giving rise to fraud or which cast uncertainty on the result of an entire election, irregularities in an election will not affect the validity of a nomination or serve to nullify the result. Daigle v. Mayor and Board of Aldermen of the Town of Rayne, 222 La. 556, 62 So. 2d 833; Womack v. Nettles, 155 La. 359, 99 So. 290.
Moreover it would appear that the issue of setting aside the results of an election because of the existence of conditions which permit the action of a voter in casting his ballot to be observed has been decided adversely to plaintiff’s contention. See Beard v. Henry, La.App., 199 So. 468; *645 Duncan v. Vernon Parish School Board, 226 La. 379, 76 So.2d 403.
For the reasons hereinabove set forth, we conclude there is no valid justification or reason for setting aside the results of the vote in precinct 1, ward 9, Livingston Parish, or precinct 1, ward 2, St. Helena Parish.
Plaintiff also advanced the alternative contention that because of an overall pattern of fraud, said to consist of vote buying, intimidation of voters, and placement of the machines in the two precincts mentioned, we should declare the present matter as falling under the ruling of Williams Cypress Company v. Police Jury of St. Martin Parish, 129 La. 267, 55 So. 878, in which it was held that whenever the courts are convinced that because of frauds and irregularities an injustice has been done a new election can and should be ordered by the court, even though specific frauds and irregularities are not shown.
From our careful reading of the evidence adduced in the case at bar we conclude the proof does not sustain the burden incumbent upon plaintiff of showing that an injustice has in fact been perpetrated herein or that the electors of the judicial district involved have been denied the right or opportunity to freely express their choice of candidates. Despite the numerous allegations of irregularities it is significant that two of plaintiff’s own witnesses testified in their opinion the election was the cleanest ever held in the parishes involved.
We have hereinabove shown that the case at bar is not one which properly falls under the ruling of the Hart case, supra, or the Williams case, supra, and admittedly plaintiff has failed to prove specific fraud or irregularities in number sufficient to alter or change the result of the election in contest.
It is unnecessary for us to consider plaintiff’s contention with respect to the irregularities surrounding the casting of absentee ballots in the election in question for the reason that assuming all absentee ballots were expunged the result of the election would not be changed or altered thereby.
As previously stated, suit No. 5198 is predicated upon the alleged lack of qualification of defendant Cornish.
In this case counsel for plaintiff points to Section 33 of Article 7 of our State Constitution which provides that district judges, among other qualifications, such as residence and years of practice, shall be a member in good standing of the Louisiana State Bar Association.
The provisions for suspension of a member of the Louisiana State Bar Association for non-payment of dues so as to disqualify him to practice law or terminate his status of good standing is governed by Section 4 of Article 5 of the Association’s Articles of Incorporation which reads as follows:
“The annual membership dues for active members who have been admitted to the practice of law in Louisiana for more than five years, shall be twenty-five ($25.00) dollars, and for those who have been admitted for less than five years, shall be five ($5.00) dollars. Members newly admitted to practice shall pay no dues until April 1st next following their admission.
“The annual membership dues shall be payable in advance to the Secretary-Treasurer on April 1st of each fiscal year. It shall be the duty of such officer to issue the appropriate certificate to each member upon payment. Inactive members shall not be required to pay dues.
“A member in default in payment of dues for thirty days, shall be regarded as delinquent, and shall be given written notice thereof by the Secretary-Treasurer. If the delinquent member fails to pay such dues within thirty *646 days after such notice of delinquency, he shall cease to be a member in good standing, and the Secretary-Treasurer shall certify to the Supreme Court that the delinquent is thus ineligible to practice law.
“Where a member has thus become ineligible, he shall be reinstated upon payment of the dues owed at the time he ceased to be a member in good standing, together with a penalty of five ($5.00) dollars and any additional dues that might be payable for the current year. Notice of the removal of his ineligibility shall be given to the Supreme Court.”
 From the foregoing it appears that once a member has acquired the status of a member in good standing he does not forfeit or lose said capacity until thirty days following receipt of notice from the secretary-treasurer of the Louisiana State Bar Association that he is delinquent in his dues. It is conceded that the defendant had paid his dues for the year 1959 and the only ground for his disqualification would be the failure to have paid his dues for 1960. As part of the burden of proof necessarily upon plaintiff to sustain her suit it becomes necessary for her to prove by a preponderance of evidence the disqualification of the defendant. A .review of the evidence offered in this case fails to show that the secretary-treasurer of the Bar Association did in fact notify the defendant of his non-payment of dues for 1960 and in consequence he retains his status as a member in good standing.
The reasons hereinabove set forth obviate the necessity of our passing upon defendant’s plea of prescription filed in suit No. 5198.
For the foregoing reasons it is obvious that plaintiff’s contention that defendant was or is unqualified is without merit.
Judgments affirmed.